(No. 11794.—Reversed and remanded.)

CYRUS N. FLETCHER et al. Appellees, vs. GRANVILLE OS-
BORN.—(GRANT FLETCHER, Appellant.)

*Opinion filed December 19, 1917—Rehearing denied Feb. 7, 1918.*

1. SPECIFIC PERFORMANCE—*what not necessary to establish oral contract to convey.* While an oral contract to convey land must be established by clear and satisfactory proof, yet it is not necessary that the contract shall be proved by any third party who heard it made.

2. SAME—*rule as to proof of contract by declarations.* An oral contract to convey land may be proved by declarations and conduct of the parties not in the presence of each other but not by declarations or acts of one party not binding on the other.

3. SAME—*what facts are not inconsistent with existence of oral agreement to convey.* Where there is sufficient evidence to establish an oral agreement to convey all the property of the promisor to one who was living with him and managing his farm, the facts that the promisor transacted some of the business relative to the property and that on several occasions he stated to witnesses that he had executed papers to effect such conveyance are not inconsistent with the existence of the oral agreement.

4. SAME—*what is not conclusive that an oral contract was not made.* The fact that the alleged promisee in an oral contract to convey filed a claim against the estate of the deceased promisor is not conclusive that the contract was not made, and is without significance where the weight of evidence establishes the oral contract and shows complete performance in reliance thereon.

5. SAME—*when provision against marriage will not render contract void.* Where the main object of an oral agreement to convey is to secure the services of the promisee in caring for the promisor and in managing his farm during his lifetime, a provision against the marriage of the promisee during the promisor's lifetime is only incidental to the carrying out of the agreement and does not render the contract void as against public policy.

APPEAL from the Circuit Court of Fayette county; the Hon. WILLIAM B. WRIGHT, Judge, presiding.

BROWN & BURNSIDE, for appellant.

JOHN H. WEBB, W. B. ROGERS, FRED A. MEYERS, and T. W. HOOPES, for appellees.

Mr. JUSTICE COOKE delivered the opinion of the court:

Granville V. E. Fletcher died in Fayette county January 20, 1915, at the age of seventy-two years. He left as his only heirs-at-law two uncles—Cyrus N. Fletcher, who lived at St. Elmo, in Fayette county, a brother of the father of deceased, who was then seventy-four years of age, and Granville Osborn, who resided in Ohio, a brother of the mother of deceased. Cyrus N. Fletcher and deceased were not on friendly terms, and according to the testimony of Cyrus had not spoken to one another for more than ten years prior to the death of deceased. No last will and testament was found among deceased's effects, and Cyrus N. Fletcher was appointed administrator of the estate by the probate court of Fayette county upon his own petition. The existence of Granville Osborn was unknown at that time to Cyrus N. Fletcher, who described himself in the petition as the sole heir of deceased. The deceased died seized of 642 acres of land near St. Elmo and personal property of the value of $6000 or $7000. Shortly after his appointment as administrator Cyrus N. Fletcher filed his bill in the circuit court of Fayette county for the partition of said real estate, making Granville Osborn the only defendant, alleging that each was the owner of an undivided one-half interest in the real estate of which Granville V. E. Fletcher died seized. After the filing of the bill Grant Fletcher, the appellant, asked leave to be made a party defendant, and the same being granted he filed his answer to the bill and also filed a cross-bill. By his cross-bill he alleged that about the year 1877, when he was eleven years of age, his father and mother both being dead, he was taken by the deceased and his mother into their home, where he lived as a member of the family until the death of the mother of deceased; that the deceased was a bachelor, never having married; that he prevailed upon appellant to remain with him and work for him, take care of the land and the crops growing thereon, and assist in every way in the management of the farm,

live stock and personal property; that deceased did not pay
appellant any sum of money as wages, but always promised
that he would take care of him and give him lands and
other property; that in February, 1898, appellant was de-
sirous of having a more definite arrangement as to the com-
pensation for his years of service, and deceased entered into
a contract and agreement with him, in and by which appel-
lant agreed to remain with deceased during the remainder
of the lifetime of deceased and care for his real estate and
look after all his interests in a general way, and that de-
ceased agreed and promised appellant that in consideration
of the years of service rendered theretofore by him and in
consideration of appellant's promise to remain with and take
care of deceased and his property so long as deceased should
live, he would convey and transfer to appellant all the prop-
erty, real and personal, that he owned at that time or might
thereafter acquire, and the benefits, use and right to sell and
convey said lands and personal property should accrue to
and vest in appellant at the death of deceased; that pur-
suant to said contract appellant remained with and cared
and provided for deceased; that the family consisted of
appellant and deceased, and that from that time until the
death of deceased appellant gave all his time and labor to
the management, control and care of deceased and of his
farm and personal property; that for ten years preceding
the death of deceased appellant had the absolute control of
all his real and personal property, residing upon the land
with deceased, renting certain portions of it and collecting
the rents therefor, employing and discharging men who
worked upon the premises, selling the crops grown thereon,
and at all times leaving with deceased the proceeds arising
therefrom, to be held and enjoyed by him during his life-
time; that during that time deceased did not interfere with
appellant's possession of the land or of the personal prop-
erty but at all times said that appellant was the owner of
all of said land and personal property; that deceased stated

282 – 10

to him that he had executed the necessary papers to transfer title to appellant, and that at his death the title, possession and right to use and dispose of all the property, real and personal, would be found in appellant. The bill then alleges that the deceased repeatedly told his intimate friends that said real and personal property belonged to appellant, and that he had no interest therein other than the use thereof during his natural life; that during all these years the deceased paid nothing to appellant except his necessary living expenses and on one occasion the sum of $1000; that from time to time he gave appellant certain articles of personal property in pursuance of the contract; that appellant has fully performed his part of the agreement by giving to deceased thirty-eight years of service, and is entitled to the specific performance of the contract so entered into and to have all the lands of which Granville V. E. Fletcher died seized conveyed to him free and clear from the rights or interests of the other parties to the proceedings. The bill concludes with a prayer for specific performance of the contract and that the court decree the execution of sufficient deeds of conveyance to appellant of the real estate of which Granville V. E. Fletcher died seized. The defendants in the cross-bill answered, the cause was heard by the chancellor and a decree entered finding that appellant had failed to establish the contract set up in his cross-bill by clear, explicit and satisfactory proof, dismissing the cross-bill for want of equity and granting the prayer of the original bill. This appeal has been perfected from that decree.

The appellant sought to prove the existence of the contract and its terms by declarations made by Granville V. E. Fletcher and by appellant during the lifetime of Granville V. E. Fletcher and by the conduct of the parties to the contract. It is insisted on the part of appellees that proof of this character is insufficient. On numerous occasions we have been called upon to determine the quantum of proof required in cases of this kind and the competency of the

evidence offered.   The rules applicable are thus stated in *Kane* v. *Hudson,* 273 Ill. 350, together with the authorities there cited in support thereof : "If an oral contract to convey land has been made and there has been such performance in reliance upon the contract as will take it out of the Statute of Frauds it will be enforced by a court of equity. Such a contract must be clear and definite and unequivocal in its terms and it must be clearly and satisfactorily proved. It is indispensable that the acts done in performance of the contract shall be referable to the contract, alone, and to have been done in performance of it.   It is not necessary that the contract shall be proved by the testimony of any witness who heard it made, and it may be proved by declarations of the parties not in the presence of each other, together with evidence of acts and conduct of the parties which shows that the agreement was made, but it cannot be proved by declarations or acts of only one party to the alleged contract not binding upon the other.—*Geer* v. *Goudy,* 174 Ill. 514; *Seitman* v. *Seitman,* 204 id. 504; *Standard* v. *Standard,* 223 id. 255; *Watson* v. *Watson,* 225 id. 412; *Daly* v. *Kohn,* 234 id. 259; *Dalby* v. *Maxfield,* 244 id. 214; *Gladville* v. *McDole,* 247 id. 34; *Willis* v. *Zorger,* 258 id. 574; *Christensen* v. *Christensen,* 265 id. 170; *Lonergan* v. *Daily,* 266 id. 189."

The principal question raised is one of fact, whether the evidence is sufficient to prove clearly and satisfactorily that a contract was entered into and what its terms were. Twenty witnesses were called to testify on behalf of appellant.   These were all persons who lived in St. Elmo or in that vicinity and who knew Granville V. E. Fletcher well in his lifetime, and some of them were among his most intimate friends.   They were all disinterested witnesses and were engaged in various pursuits.   Among them were farmers living in the vicinity of the Fletcher farm, merchants engaged in business in St. Elmo, a physician, a minister and mechanics.   These witnesses testified to conversations had

with the deceased during the last twenty-five years of his life. Many of them testified to repeated conversations on the subject of the agreement or contract which the deceased stated he had entered into with appellant. The general effect of this testimony was that Granville V. E. Fletcher stated that he had made an agreement with appellant that if appellant would remain with him and care for him and take charge of his property and superintend the farm during his lifetime he should have whatever property the deceased possessed at the time of his death. One witness testified that in 1898 the deceased told him at the farm that he had entered into an agreement with appellant that if he should stay there and remain single until the deceased should die he was to get everything that was there. The same witness testified that in the fall before Fletcher died he had a conversation with him at St. Elmo in which he stated that he did not own anything on the farm but the horse he was driving; that appellant owned everything else; and that the deceased further stated that appellant had about filled his part of the contract and he was satisfied he would stay with him until he died. Another witness, a hardware merchant at St. Elmo and a man who had been intimately acquainted with deceased for more than fifty years, testified that deceased often came into his private office and discussed his affairs with him, and at one time, twenty-five years prior to his death, the deceased told him that if appellant stayed with him as long as he lived he had agreed with him that he should have all the property deceased had, both real and personal; that deceased had discussed the same matter with him a number of times since, the last conversation being about a year before his death, at which time he repeated, in substance, the statement he had made on the first occasion. This witness further testified that he was in the habit of visiting frequently at the deceased's home on the farm, and that on one of these occasions he had a conversation with deceased, in the presence and hear-

ing of appellant, in which the deceased said, "That fellow there," pointing to appellant, "owns everything here," and stated further that appellant was to have everything that was there. Two witnesses testified to statements made by the deceased in the office of a police magistrate in St. Elmo about two months before he died, in which he stated that he was going to give all his property to appellant and that he had it all fixed. Another testified that he stopped frequently at the home of deceased, and that on one occasion the deceased told him that he did not own any property; that it all belonged to appellant, and that all he owned was the old horse and buggy. Another testified that fourteen years prior to his death he had worked for the deceased for a year; that on one occasion deceased said, referring to appellant, "There is a fellow, if he stays with me until I am dead and gone, gets everything I have got;" that he stated that appellant was to stay single while he was there, and if he stayed with him and remained single he was to have everything he owned, and that he intended to make a will to that effect. Another witness, a minister, testified that he heard the deceased state to a sister of appellant shortly before her death and when she was suffering from her last illness, that she need not worry about her brother's condition in life; that he had fixed everything, and that appellant was to have everything he had. Another witness testified that about fifteen years previously deceased had talked to him about the disposition of his property, and stated that he had arranged with appellant that if he stayed with him and remained single as long as deceased lived, when he was done with his property appellant should have all of it; that the deceased made the same statement to him, in substance, on several occasions; that the last time he mentioned it to him was about two years prior to his death, on which occasion he said that everything he had was appellant's, and that everything down there (referring to the farm) belonged to appellant. Another witness, a re-

tired farmer, testified that he accompanied the deceased to
St. Elmo on one occasion about a year before he died, when
he stated to him that he had given everything to appellant,
and that he was to have everything he owned if he stayed
with him and remained single until he died.   Another wit-
ness testified that on one occasion when he was attempting
to buy some mules from deceased he informed him that he
would have to see appellant, as all the property belonged to
him.   Another witness testified that he had known deceased
for ten years, and that deceased had boarded at his hotel
four or five years prior to his death; that appellant came
to see deceased frequently while he was there, and that de-
ceased stated to him that appellant had lived with him from
the time he was eleven years old, and he ought to be atten-
tive to him because he was to get everything he had after
he was gone.   Another witness who owned a farm adjoin-
ing that of deceased and who had known him all his life
testified that about a year before his death he had a con-
versation with him in which they were discussing appellant
and what a good boy he had been to stay with him; that
deceased said that appellant had served him there a long
time and he did not do anything at all any more; that he
expected some day to give appellant all his property; that
at one time he had told appellant he would make him a
deed for the land, but they had talked the matter over and
thought it was not the best thing to do, as appellant might
die before he did; that deceased said he would fix it any-
way so appellant would get it when he was through with
it.   The witness further testified that he had another con-
versation with deceased about four years before he died, in
which he stated that appellant would have plenty to do him
after he died, as he had it fixed so that he would get all his
property.   Another witness testified that on Thanksgiving
day prior to the death of deceased he asked his permission
to hunt quail on his farm, and that deceased told him he
would not allow his best friend to do that, but when he

was through with it appellant could do as he pleased about it. Another witness testified that at one time he attempted to rent land of deceased, and that he informed him he would not rent his land to anyone as long as he lived, but when he was through appellant could do as he pleased. Another witness testified that during the summer before he died the deceased informed him that he and appellant had a contract that if appellant stayed with him as long as he lived he was to get everything he had. Another witness who owned an adjoining farm and had known the deceased all his life, testified that in 1914 deceased came to him and told him that appellant wanted to see the witness about getting him to put in his part of a division fence; that appellant wanted the fence through, as he desired to use the land for pasture; that the witness told deceased he would not put in the fence, and deceased then asked him to see appellant; that he talked with appellant and finally agreed with him what part he was to build and what part appellant was to build; that afterward deceased told him whatever arrangement he made with appellant was satisfactory to him; that he was allowing appellant to fix things to suit himself, as then, maybe, it would suit him better after a while; that he had things already fixed that way and asked the witness to say nothing about that for the present; that after the fence was fixed the witness asked the deceased to come out and see how he liked what they had done, and deceased remarked, "You know what I told you." Another witness testified that the fall before he died deceased told him that all the property he owned then was a horse and buggy and that all the other property belonged to appellant; that he did not know how long he was going to live; that he had arranged everything; that he had fixed out the papers to appellant and appellant was to get everything he had. Another witness testified that deceased told him during the last four or five years of his life that he had turned everything over to Grant; that he did not own anything any more ex-

cept his horse; that he had fixed everything for Grant, as he had taken care of the deceased and he meant to take care of him. A physician living at St. Elmo testified that he had known the deceased and appellant for thirty-three years and was their family physician; that deceased came to his office almost every time he was in St. Elmo and on numerous occasions had talked with him about his business relations with appellant, and that when the witness asked him what he expected to do with his property when he was done with it, he stated that it was all appellant's; that six months before his death he stated that appellant was to·have all he had; that he had been a good boy and stayed with him, and that it was all his. Mrs. Nancy Walker testified that appellant was her nephew, and that about the year 1877, when appellant was eleven years of age, she took him to the home of deceased and had a talk with him about the conditions under which the boy was to be taken into the family; that deceased told her he would treat the boy as he would his own child as long as he stayed with him; that he could attend the common schools, and if he wanted to go he would send him to college; that he would provide for him as if he was his own son, and if he stayed with him and his mother while they lived he would be their sole heir. She testified that the mother of the deceased also made the same promise. This witness frequently visited the Fletcher home, and testified that during the last five years of his life deceased told her he had fixed everything for appellant; that he had an agreement that everything was to be appellant's if he remained with him and remained single. A number of witnesses testified that appellant stated to them, during the lifetime of deceased, that he had a contract or agreement with deceased that if he stayed there and took care of deceased during his lifetime he was to receive everything.

At the time appellant was taken into the family of the deceased he owned a small interest in some property located

in St. Elmo. The deceased was appointed guardian of appellant and acted in that capacity during his minority. The testimony all discloses that during the time from about 1877, when he was taken into the family of deceased, until the death of deceased, appellant remained there constantly, and after he had grown to manhood he assumed the active management and superintendence of the real estate and personal property belonging to the deceased. Appellant was a cousin of deceased, being a son of a brother of deceased's father. After the death of the mother of deceased he and appellant lived alone on the farm, doing their own housework and managing the general farm work. It appears that during all these years appellant faithfully complied with the provisions of the contract.

The defendants in the cross-bill, who are appellees here, called a number of witnesses in an attempt to meet the allegations of the cross-bill. A number of these witnesses corroborated the contention of appellant that the contract alleged in the cross-bill had been entered into between him and deceased, by testifying to statements made by deceased which strongly tended to show the existence of the agreement. Many of appellees' witnesses testified simply to the fact that they had transacted some business with the deceased during the last ten years of his life. This testimony has but a slight bearing upon the issues. It was not contended that under the agreement appellant was to have the present title to and possession of the property but that he was simply to superintend and manage it. The mere fact that deceased may have transacted some of the business relative to the buying and selling of property and received the money for property sold does not tend to contradict the claim of appellant that the contract alleged had been entered into. One witness for appellees testified that in 1910 deceased asked him to come and live with him; that he was getting old and wanted someone to help around the house; that he made the witness the proposition that if he

would come and live with him during the remainder of his lifetime he would give him one-half of what he owned, stating that it would probably amount to about $30,000, but the witness did not accept the proposition. Another witness, one of the attorneys for Cyrus N. Fletcher, testified, over objection to his competency, that on two occasions deceased told him that if he could leave his property to the masonic lodge it would be about the best thing he could do, and that he did not know but the lodge would be a good party to leave property to. The testimony of these two witnesses was objected to as incompetent. Assuming that it was competent, it was not sufficient to discredit or overthrow the proof made by appellant as to the existence of the contract.

Appellee Cyrus N. Fletcher, his attorney and another witness all testified that after Cyrus N. Fletcher had been appointed administrator he met appellant at the farm of deceased and appellant told the attorney he had a gun there that deceased had given to him which he would like to have, and that he also had a Bible and his mother's picture in his room, and asked if he could have those; that the attorney then asked him if that was all, and he said, "No, the horses in the barn are mine; that is all I claim." It is contended that this conduct is inconsistent with the claim of appellant that he was the owner of all the property after the death of deceased. Cyrus N. Fletcher was appointed administrator January 27. On February 24 a stipulation was filed in the probate court whereby it was stipulated between appellant and Cyrus N. Fletcher, who was described as administrator and sole heir-at-law of Granville V. E. Fletcher, that the administrator should proceed to sell all the property on the farm at public sale; that appellant should not be required to replevin or claim any of the specific property, but that thereafter he should be permitted to make such proof as he could introduce that he was the owner of the property, and that the money arising from

the sale was to stand in the place of the property and be the subject of the litigation just as though claim had been made to the specific property. It does not appear from the record when this stipulation was entered into or the exact date the conversation at the farm occurred between appellant, Cyrus N. Fletcher and his attorney, but the transactions were contemporaneous, and conceding that appellant made the statements as testified to by these witnesses, (although he denies this,) there is nothing in them inconsistent with the position of the parties at that time and their attitude toward one another in the light of this stipulation. Cyrus N. Fletcher also testified that on this occasion appellant informed him that he had no contract, written or verbal, with the deceased in reference to his services there or to what he should receive. This is flatly denied by appellant. In the light of all the proof and all the circumstances shown in the case, the testimony of Cyrus N. Fletcher on this point is too improbable to entitle it to serious consideration.

It appears that some time prior to the hearing on the bill and cross-bill appellant filed a claim against the estate of Granville V. E. Fletcher. The record does not disclose the amount of this claim or what it was for. It simply shows that a claim was filed, and it is insisted that this strongly tends to show that no such contract as is alleged was entered into between appellant and deceased. It is true that the filing of a claim against this estate by appellant on any account is inconsistent with his claim that he owned all the property upon the death of deceased. It is not conclusive, however, that no such contract as that alleged had been entered into. Appellant undoubtedly realized that it would be difficult to make the required proof of a contract of this kind, and determined, in the event he failed to prove his contract, to secure some remuneration for the services he had performed. While the filing of the claim tends to disprove appellant's claim that a contract had been entered

into, when it is considered together with all the evidence in the case its effect is so slight as to become insignificant. The great weight of the evidence shows that the contract had been entered into by deceased with appellant as alleged and that appellant fully performed his part of it.

The evidence is convincing and establishes beyond a doubt that the deceased promised appellant if he would live with him, take care of him and manage his property during his lifetime appellant should have all his property. The fact that deceased stated on a number of occasions that he had fixed it so appellant would own the property at his death, that he had executed papers to that effect and that he had executed a will, is not inconsistent with the claim of appellant that the contract was entered into. Had the deceased done any of these things it would have been simply for the purpose of executing the agreement he had entered into. It may be that, in fact, he did execute a will or a deed that may yet be found, whereby he has executed this contract. The court erred in holding that the contract had not been clearly and satisfactorily proven.

The only question remaining is whether the contract as proven was illegal and void as against public policy. It clearly appears that one of the provisions of the contract was that appellant should remain unmarried during the life-time of Granville V. E. Fletcher. The subject matter of the contract was not, however, in reference to restraint of marriage. Appellant and deceased did not contract expressly for a restraint upon the marriage of appellant, but they were contracting for the services of appellant in caring for deceased and in superintending the management of his property. The provision that appellant should remain unmarried during this period of service was merely an incident to the main object of the contract. There can be no question that if these parties had contracted expressly for a restraint upon the marriage of appellant, their contract, under all the authorities, would be void and unen-

forcible.    There is a dearth of authority upon the effect of
a contract where the restraint upon the marriage is a mere
incident to the main object and purpose of the contract.
In *King* v. *King,* 63 Ohio St. 363, a contract was entered
into by which one person agreed to live with and take care
of another during his life, and further agreed not to marry
during such service, in consideration of the agreement of
the other that he would provide for her sufficiently to make
her comfortable and well off.    It was there held that this
contract was not necessarily invalid; that although the
promise not to marry is in itself a void promise, as against
public policy, yet that it was a mere incident to the main
engagement, which was for labor and care, and if that ser-
vice was fully performed and the recipient failed to per-
form his engagement during life the other might maintain
an action against his estate on the contract.    The holding
was also based on the further ground that in such cases the
mischiefs likely to ensue to the public by permitting a re-
covery notwithstanding the void stipulation would be less
than those likely to follow a holding which would encour-
age the violation of contracts and the repudiation of just
obligations after full value had been received.    To the same
effect is *Crowder-Jones* v. *Sullivan,* 9 Ont. L. R. 27, where
a like situation was presented and a like holding had.    These
two cases are nearly identical in their facts with the case
at bar, and in our judgment correctly state the law as ap-
plied to such a contract and such facts as are shown here.
In *Shackelford* v. *Hall,* 19 Ill. 212, it was held that a de-
vise in a will with a condition that the devisee shall not
marry until he or she arrives at the age of twenty-one
years is lawful and that a violation of it after notice must
be held to have forfeited the estate devised.    In arriving at
this conclusion we said: "Whoever will take the trouble
to examine this branch of the law attentively will find that
the testator may impose reasonable and prudent restraints
upon the marriage of the objects of his bounty by means

of conditions precedent or subsequent, or by limitations, while he may not, with one single exception, impose perpetual celibacy upon the objects of his bounty by means of conditions subsequent or limitations. That exception is in the case of a husband in making bequests or legacies to his own wife. * * * An examination of the subject will show that the courts have very rarely held such condition void, although it might appear harsh, arbitrary and unreasonable, so as it did not absolutely prohibit the marriage of the party within the period wherein issue of the marriage might be expected." The contract entered into between appellant and the deceased was not for the express purpose of restraining marriage, nor did it, as an incident, impose perpetual celibacy upon appellant. Under the authorities cited the contract was not void for the reasons urged.

The decree of the circuit court is reversed and the cause is remanded, with directions to dismiss the original bill and grant the relief prayed in the cross-bill.

*Reversed and remanded, with directions.*