**BARNES v. HOBSON et al. (No. 2698.)** *

(Court of Civil Appeals of Texas. Texarkana. March 14, 1923. Rehearing Denied March 22, 1923.)

**1. Contracts ⚵�longrightarrow 111—In general restraint of marriage void as against public policy.**

Every contract in general restraint of marriage is void as against public policy.

**2. Contracts ⚵⟶111—Validity of contract partially restraining marriage depends on reasonableness; "general restraint."**

The validity of a contract restraining marriage to a particular person or a person of a particular class, or within a specified time, depends on the reasonableness of such restraint; "general restraint," as used in the rule invalidating contracts in general restraint of mar-

riage, meaning restraint binding a competent person not to marry any one at any time.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, General Restraint.]

**3. Contracts ⚵⟶111—Contract to will property in consideration of promise not to marry until certain time held not void as unreasonably restraining marriage.**

A contract to will property to a 16 year old niece, who, because of her mother's death and her father's poverty and remarriage, was largely dependent on her uncle, who evinced considerable interest in her welfare, in consideration of her promise not to marry until she was 22, held not invalid as unreasonably restraining marriage.

**4. Wills ⚵⟶59 — Agreement not to present claim against estate sufficient consideration for contract to will property.**

A grandchild's agreement not to present a claim against her grandmother's estate would be a sufficient consideration for her uncle's contract to will property to her.

**5. Wills ⚵⟶59—Promise to be good girl insufficient consideration for contract to will property.**

A 16 year old girl's promise to be a good girl until she was 22 held not a sufficient consideration for her uncle's contract to will property to her.

**6. Contracts ⚵⟶137(3)—Promise to will property in consideration of promise not to marry, and to be good girl, until certain time, not void as partly based on illegal consideration.**

If a 16 year old girl's promise to be a good girl until she was 22 be a sufficient consideration for her uncle's contract to will property to her, such contract would be enforceable, though a further consideration, consisting of her promise not to marry until she was 22, were void as contrary to public policy; the rule that a promise for which there are several considerations, some of which are illegal, is wholly void, being inapplicable, as neither of the two considerations is illegal.

**7. Judgment ⚵⟶527—In view of findings, judgment for reasonable value of services rendered decedent held based on express contract.**

In an action against an administratrix for damages sustained by decedent's breach of a contract to furnish plaintiff necessary living expenses, etc., and will her a certain house and lot if she would keep house for him until she was 22, or, in the alternative, for the reasonable value of the services rendered, a judgment for the reasonable value of such services, when construed in view of the findings, held based on the express, rather than the implied, contract, in view of the court's findings as to decedent's breach thereof, and plaintiff's willingness and readiness to perform.

**8. Wills ⚵⟶58(2)—Contract to will property in return for services must be fully and satisfactorily proved.**

An agreement to make a will in return for services must be fully and satisfactorily proved.

---

⚵⟶For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

*Writ of error refused May 9, 1923.

**9. Wills** ⊕=58(2)—**Evidence held insufficient to show contract to devise specific property in consideration of services rendered.** ·

In an action for damages for breach of a contract to bequeath plaintiff certain property in consideration of her agreement to live with and keep house for decedent until she was 22, evidence *held* insufficient to warrant a finding that such contract was made, though sufficient to show decedent's intent to compensate plaintiff for services rendered.

**10. Appeal and error** ⊕=856(1)—**Judgment not sustained by evidence of express contract on which based not affirmed, though supported by pleading and testimony as to implied contract, suit on which was barred by limitations.**

Where a suit for the value of property, which defendant's intestate was alleged to have agreed to devise to plaintiff in consideration of her agreement to live with and keep house for him until a certain time, or, in the alternative, for the value of services rendered, was not commenced until more than two years after she ceased to perform such services by reason of decedent's breach of the express contract, a judgment based on such contract, rather than the implied contract for the value of the services, will not be affirmed, where not sustained by sufficient evidence of the existence thereof, though supported by the pleading and testimony as to the implied contract, suit on which was barred by limitations.

Hodges, J., dissenting.

Appeal from District Court, Lamar County; Newman Phillips, Judge.

Suit by Ella Hobson and husband against Ida Barnes, administratrix of the estate of T. W. Barnes, deceased. From a judgment for plaintiffs in part, plaintiffs and defendant appeal. Affirmed in part, and reversed and rendered in part.

This suit was by appellee Ella Hobson, joined by her husband, A. W. Hobson, the other appellee, against appellant, as the administratrix with the will annexed of the estate of her (appellant's) deceased husband, T. W. Barnes (who died January 25, 1921), to establish certain claims of said Ella Hobson against said estate which appellant as administratrix had rejected. One of the claims was for $5,000, which appellees alleged was the damages Ella Hobson had suffered because of a breach by said T. W. Barnes of a contract he had entered into with her in November, 1913, when she was about 16 years of age, whereby he bound himself to will her a house and lot of that value in Dallas if she would "not marry and be a good girl until she was 22 years old." The other claim was for $7,000, which appellees alleged was the damages Ella Hobson sustained because of a breach by said T. W. Barnes of a contract which they alleged he entered into with her in June, 1916, whereby he bound himself to "furnish her

with all necessary living expenses and household expenses and wearing apparel" and will her when he died a house and lot in Dallas known as No. 4017 Worth street, of the value of $7,000, if she would go to Dallas and keep house for him until she was 22 years of age. With reference to this claim appellees alleged that Ella Hobson went to Dallas and kept house for said T. W. Barnes, in performance of her undertaking under the contract, until a short time before she became 22 years of age, when she was compelled to cease further performance because of the refusal of said T. W. Barnes to longer furnish her with living and household expenses and wearing apparel. She prayed that should the court determine she was not entitled to have her claim established for the $7,000, the value of 4017 Worth street, that it be established for the sum of $1,550, the reasonable value of the services she rendered while she kept house for T. W. Barnes in performance of her undertaking under the contract.

The trial was to the court without a jury, and he found the facts to be: (1) That on November 11, 1913, when Ella Hobson, then Ella Barnes, was 16 years old, T. W. Barnes made a contract in writing with her "to the effect that if she would not marry before she was 22 years old he would bequeath her real property in Dallas, Tex., of the value of $5,000." (2) That Ella Hobson was T. W. Barnes' brother's child, and that relying on the undertaking of said T. W. Barnes she remained single "according to her agreement and did not marry until after she had reached the age of 22 years." (3) "That T. W. Barnes had affection for his niece (Ella Hobson) and was interested in her welfare, and was moved to make said agreement with her because of his interest in her and a desire to guard her against marrying until she had reached her maturity." (4) "That T. W. Barnes was a single man and had no family at the time of entering into the aforesaid agreement. That after making said agreement, and on the 9th day of September, 1919, and after he had intermarried with the defendant (appellant here), he executed his last will and testament, disposing of all his property, and failed to bequeath any property whatever to his niece Ella Barnes." (5) "That at the time T. W. Barnes executed said agreement with the plaintiff (appellee Ella Hobson), he owned real property in Dallas, Tex., in value far in excess of $5,000, and at the time of his death owned real property in Dallas, Tex., of the value of over $30,000." On the facts found by him as stated, the court concluded that—

The "transaction constituted a contract," quoting, "especially as the niece kept and performed her part of it (even though the consideration might not be a good consideration). As

⊕=*For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes*

the plaintiff kept her part of the contract and did forego and deny herself the privilege of exercising her right to marry, after the time when she could rightfully and legally have married, in order to carry out the agreement with her uncle, I find that such facts constitute a valuable consideration, for the breach of which plaintiff is entitled to recover the sum of $5,-000. I conclude that the contract is not void as being against public policy, in that it did not have for its purpose a general restraint of marriage, but only a postponement of marriage until the niece was 22 years old; and I find that such restraint was not unreasonable, but was a reasonable restraint and not in any manner prejudicial to the good order of the state or of society."

The trial court further found the following to be facts established by the testimony:

"That on or about the 19th day of June, 1916, the deceased, T. W. Barnes, made a contract with his niece, Ella Barnes, by which he agreed in consideration of her living with and keeping house for him in Dallas, Tex., until she was 22 years of age, he would at his death bequeath to her the property situated at 4017 Worth street in Dallas, Tex., alleged by plaintiff to be of the value of $7,000. I find that Ella Barnes entered into said contract and went to Dallas and lived with and kept house for her uncle, T. W. Barnes, from said date until the 15th day of January, 1919. I find that T. W. Barnes abandoned said contract at about the date referred to above, and for that reason Ella Barnes did not render service until she was 22 years old, which I find she would have been on the 25th day of February, 1919. I find that Ella Barnes was willing and ready to carry out said contract. I find that T. W. Barnes did on the 20th day of November, 1916, execute according to law his last will and testament, whereby he bequeathed to Ella Barnes real property in Dallas, Tex., far in excess of the value of the Worth street property, which T. W. Barnes owned at that time; but that subsequent to said date T. W. Barnes revoked said last will and executed another last will, whereby he disposed of his entire estate without bequeathing the Worth street property, or any other property, to Ella Barnes. That at his death, which occurred on the 25th day of January, 1921, he owned the Worth street property, which I find was of the value of $5,-000, and other real property in Dallas, and other real property worth in the aggregate sum of $30,000."

And concluded that—

On those facts Ella Hobson was "not entitled to recover the value of the Worth street property, but is legally entitled to recover from the estate of T. W. Barnes the reasonable value of her services for the time she worked for T. W. Barnes, as shown in the above finding, which services I find of the reasonable value of $35 per month for 30 months, and aggregating $1,-050."

In accordance with his conclusions, the trial court rendered judgment establishing claims in Ella Hobson's favor against the estate of T. W. Barnes, deceased, for $5,000 and $1,050, respectively. Thereupon both the appellant and appellees prosecuted an appeal.

J. S. Patrick, of Paris, for appellant.
Connor & Baldwin, of Paris, for appellees.

WILLSON, C. J. (after stating the facts as above). It conclusively appeared at the hearing in the trial court that Ella Hobson complied with the condition in the contract whereby T. W. Barnes agreed to will her a house and lot in Dallas worth $5,000 if she would not marry and be a good girl until she was 22 years of age, and that said T. W. Barnes failed to make any provision whatever for her in his last will. Therefore the judgment was not erroneous, so far as it established the claim for $5,000 asserted by Ella Hobson, unless the contract, because in restraint of marriage, was void within the rule of law applicable to contracts of that nature.

[1] On the theory that the rule was that every contract in general restraint of marriage was void because against public policy, appellant insisted in the court below, and insists here, that the contract in question was invalid because, she asserts, the restraint it imposed on Ella Hobson was "general." Appellees do not controvert the correctness of appellant's statement of the rule, but they insist the contract was valid because, they assert, the restraint it imposed on Ella Hobson was not general, but was partial only and reasonable under the circumstances shown in the testimony.

There is no doubt the rule is as appellant states it. 1 Paige on Contracts, § 424; 2 Elliott on Contracts, § 753; 6 R. C. L. p. 768. The doubt is as to what constitutes "general restraint" within its meaning.

Unquestionably a contract which bound a competent person who had never married to never marry would be such restraint. And unquestionably, the restraint imposed by an agreement which bound such a person, as the one in question here did, not to marry until she was 22 years of age, was "general" in the sense that it forbade her marrying any person before she reached that age. But it was not "general" in the sense that it bound her never to marry. It left her at liberty to marry any person she chose to at any time after she became 22 years of age.

The question presented does not appear ever to have been before an appellate court in this state. The cases cited by appellant from other jurisdictions as supporting her contention are: Lowe v. Doremus, 84 N. J. Law, 658, 87 Atl. 459, 49 L. R. A. (N. S.) 632; McCoy v. Flynn, 169 Iowa, 622, 151 N. W. 465, L. R. A. 1915D, 1064; King v. King, 63 Ohio St. 363, 59 N. E. 111, 52 L. R. A. 157, 81 Am. St. Rep. 635; Chalfant v. Payton, 91 Ind. 202, 46 Am. Rep. 586; Sterling v. Sinnickson, 5 N. J. Law, 756; and Hooks v.

Bridgewater, 111 Tex. 122, 229 S. W. 1114, 15 A. L. R. 216.

In the Doremus Case Mary Lowe sought a recovery against the executor of one Van Riper on a promissory note made by said Van Riper, by which he promised and authorized his executor to pay the plaintiff $3,000 30 days after his death. The consideration of the note was the undertaking of Mary Lowe to continue in Van Riper's employ and take care of him and not to marry until after his death. It was held that the contract "was in general restraint of marriage, and consequently void."

In the Flynn Case it appeared that Flynn and Miss McCoy had been betrothed, and that Flynn, having breached his agreement to marry her, paid her a sum of money June 17, 1909, and agreed to pay her $5,000 additional if she did not marry before July 1, 1912. It was held that the contract was void. After saying that "in order to obtain the $5,000 plaintiff was compelled to remain single for something more than three years, notwithstanding how many favorable opportunities she might have for a desirable marriage," the court added:

"It is hornbook law that contracts in restraint of marriage are illegal, and, as a rule, it makes no difference how long the restraint. Of course there are many exceptions to this rule. * * * In some cases it is held that, if the restraint be reasonable, it is not inimical to public policy; but there is nothing in the record showing any reason for the making of the stipulation, and no facts are pleaded, which would justify any such limitation upon the plaintiff's right in morals or in law to take upon herself the relations of a wife, notwithstanding the breach of promise on the part of Flynn. No benefit or advantage to him is shown, but, for reasons known only to him, he made his promise conditional on the fact that his former fiancee should not marry during the three years. The immediate tendency of this promise was to discourage marriage, and as a rule, that tendency stamps such contracts as illegal."

In the King Case it appeared that King had agreed with the plaintiff, a daughter of his niece, that "he would provide for her amply sufficient to make her comfortable and well off" if she "would refrain from marriage while he should live, and * * * would live with him and take care of him while he lived." The suit was against King's executor. It was held that the agreement was void so far as it bound the plaintiff not to marry, but the judgment in her favor was affirmed on the ground that that part of the agreement was but an incident to the main consideration to King for his undertaking, to wit, labor the plaintiff was to perform for and care she was to take of him.

In the Payton Case it appeared that persons doing business as a "marriage benefit association" contracted with a person to pay him $3,960 at the end of two years if he did not get married within that time, and if he married within the two years to pay him $5.50 for each day that he remained single after the date of the contract. It was held that the contract was contrary to public policy and void.

The Sinnickson Case is not reported in books we have had access to, but it appears from the opinion of the court in the Doremus Case and the opinion in the McCoy Case, both of which cite and discuss it, that it was a suit "on a sealed bill, the maker of which promised to pay $1,000 to the payee provided he (the payee) was not lawfully married in the course of six months from the date thereof." It was held that the agreement was void on the ground, it is stated in the Doremus Case, that it was in restraint of marriage and therefore against public policy.

The plaintiff in the Hooks Case sought to enforce against the estate of one Davis a verbal agreement the plaintiff's father entered into with Davis during the latter's lifetime, whereby the father contracted to surrender the custody and control of the plaintiff, then nine years old, to Davis, in consideration of the undertaking of Davis to rear and care for the plaintiff as a son, make him his heir, and leave him all of his property at his (Davis') death. It was held that the contract was against public policy and void. The case is cited by appellant, it seems, because of the statement in the opinion of the court that—

"Davis could not have enforced it (the contract) because based upon a void consideration. If Davis could not have enforced it against the plaintiff, it is not enforceable in the plaintiff's favor."

We do not see that the case is of any value in determining the question presented here as to the validity of the consideration for T. W. Barnes' undertaking. Had the consideration in the Hooks Case been a sufficient one, and had the father breached his undertaking under the contract during Davis' lifetime, we apprehend the court would have held that Davis could maintain an action for the breach.

The cases cited by appellees as supporting their view of the contract are: Hogan v. Curtin, 88 N. Y. 162, 42 Am. Rep. 244; Phillips v. Ferguson, 85 Va. 509, 8 S. E. 241, 1 L. R. A. 837, 17 Am. St. Rep. 78; Knost v. Knost, 229 Mo. 170, 129 S. W. 665, 49 L. R. A. (N. S.) 627; Lowe v. Doremus, 84 N. J. Law, 658, 87 Atl. 459, 49 L. R. A. (N. S.) 632, also cited by appellant as shown above; and Little v. Birdwell, 21 Tex. 610, 73 Am. Dec. 242.

In the Curtin Case the testator provided in his will that his daughter should have $16,000 at her majority or marriage before with the consent of her mother and his executors, and in case she married against such consent she was to have but $5,000. The daughter married before she reached her

majority with the consent of the sole executor but without the consent of the mother. It was held that the marriage of the daughter without her mother's consent was a breach of the condition. In discussing the question the court said:

"A condition prohibiting marriage before twenty-one without consent, is by the common law valid and lawful. It is otherwise of conditions in general restraint of marriage, they being regarded as contrary to public policy, and the 'common weal and good order of society.' But reasonable conditions designed to prevent hasty or imprudent marriages, and to subject a child, or other object of the testator's bounty, to the just restraint of parents or friends during infancy, or other reasonable period, are upheld by the common law, not only because they are proper in themselves, but because by upholding them the law protects the owner of the property in disposing of it under such lawful limitations and conditions as he may prescribe."

In the Ferguson Case it appeared that the testator had eight children. He directed $5,000 to be laid out in land to be divided among six of them. The residue of his property was to be divided among the eight children. He declared in the will that if either of his children should marry into the Phillips family the child so marrying should take only $3 of his estate. One of his daughters married into the Phillips family before the death of the testator. It was held that the daughter took only $3. In discussing a question presented as to the reasonableness of the condition in the will the court said:

"The law * * * recognizes as valid conditions in restraint of marriage which are just, fair and reasonable; and what is such a condition must, to a great extent, be determined upon the circumstances of each particular case."

In the Knost Case the testator devised to his daughter Anna an interest in his estate greater in value than that he devised to his other children, and then provided that in the event Anna married she should take only the interest his other children took in the estate. The proviso was held to be in general restraint of marriage and therefore void. The court said:

"The restraint on marriage was total. It was not leveled at marriage to a given person or to a communicant of a given church, or limited to a certain age or to a reasonable time. Any marriage whatever, however appropriate, at any time however reasonable to any person however suitable, took from Anna Marie Louisa a part of the estate vested in her by the will."

In the Birdwell Case the will provided that the testator's widow was to have his property "during her lifetime or widowhood." It is cited, it seems, only because the court quoted with apparent approval the following from 1 Story's Eq. Jur. § 280:

"Conditions, annexed to gifts, legacies, and devises, in restraint of marriage, are not void, if they are reasonable in themselves, and do not directly or virtually operate as an undue restraint upon the freedom of marriage. If the condition is in restraint of marriage generally, then, indeed, as a condition against public policy, and the due economy and morality of domestic life, it will be held utterly void. And so, if the condition is not in restraint of marriage generally, but still the prohibition is of so rigid a nature, or so tied up to particular circumstances, that the party upon whom it is to operate, is unreasonably restrained in the choice of marriage, it will fall under the like consideration."

In addition to the cases referred to by the parties, the following may be cited as pertinent to the question: Fletcher v. Osborn, 282 Ill. 143, 118 N. E. 446, L. R. A. 1918C, 331; Crowder-Jones v. Sullivan, 9 Ont. L. 27, 4 Ann. Cas. 729; White v. Equitable Mutual Benefit Union, 76 Ala. 251, 52 Am. Rep. 325.

In the Osborn Case the undertaking of the intestate was to give property to Grant Fletcher if the latter would stay with him and render specified service and remain single during the lifetime of the intestate. It was held that the agreement to remain single was incidental to the undertaking to stay with and render the service to the testator, and therefore that the contract was not invalid because in restraint of marriage.

In the Sullivan Case a promissory note given by a widower to his housekeeper in consideration of her foregoing a proposed marriage and continuing in his service was held to be valid, on the ground that the restraint of marriage was merely an incident to the contract and not so unreasonable as to be contrary to the policy of the law.

In the White Case the certificate issued to the member of the association provided that—

"No member will be entitled to any benefit whatever, who marries in less time than three months from the date of his certificate."

The restraint imposed was held to be partial only, but the contract was held to be void because it did not further appear that it was reasonable.

It will be noted that while it was held in the Doremus and Flynn Cases that the restraint imposed by an agreement not to marry within a specified limited time was "general" within the meaning of the rule, it was intimated in the Knost Case and held in the White Case that restraint of that kind was "partial" only, and, in effect, that whether a contract was enforceable or not in a given case depended upon whether the restraint imposed, when considered with reference to the circumstances of such case, appeared to be reasonable or not.

[2] We are inclined to think, in the light of all the authorities, and having in mind the basis of the rule, to wit, the interest the public has in the matter, that the term "gen-

eral restraint" as used in the rule should be construed to mean restraint which binds a competent person not to marry any one at any time, and that the validity of a contract, where the restraint it imposes is only against marrying a particular person, or a person of a particular class, or within a specified limited time, should be determined with reference to the reasonableness of such restraint under the circumstances of the particular case. It might very well be that the public interest would be best served by upholding such a contract under the circumstances of one case, and by refusing to uphold it under the circumstances of another case. It seems to us that the doctrine now recognized by the courts is well stated in 6 R. C. L. 768, where it is said:

"The most that can be said is that it is only contracts in general restraint of marriage that are void on grounds of public policy. Although in many of the cases the broad rule is laid that contracts having a tendency to restrain marriage are void on grounds of public policy, there seems to be a tendency to limit the operation of the rule to such restraints as are unreasonable having regard to the relation of the parties and the object of the contract. Where, however, the restraint imposed is regarded as unreasonable, it is immaterial that it is for a limited period."

[3] Holding, as we do, that the restraint imposed by the contract on Ella Hobson was not general, but partial only, the question remaining as to its validity is one as to the reasonableness of the restraint; for notwithstanding the restraint was partial only, if it was unreasonable under the circumstances shown in the testimony, the contract was void because contrary to public policy.

The circumstances were: Ella Hobson was the child of T. W. Barnes' brother. Her mother died at her birth in February, 1897. Her father (poor, financially) married again in 1907, and in 1911 she went to live on a farm with her grandmother, T. W. Barnes' mother, where she remained, doing all kinds of farm work and taking care of T. W. Barnes' mother, who was almost helpless, until 1913, when her grandmother died. She then lived for a while with J. A. Barnes, brother of T. W. Barnes, who paid J. A. Barnes her board. She was about 16 years old in 1913, when the contract in question was made. T. W. Barnes was then a childless widower about 48 years of age. In a letter dated November 11, 1913, containing the proposition which Ella Hobson accepted, T. W. Barnes wrote her as follows:

"Ella, I have made my accident insurance policy payable to you in case I get killed on R. R. or other accidental way you will get $5,000. Now if you will promise me that you won't marry and be a good girl until your are 22 years old I will give you a good house and lot in Dallas, Tex., worth $5,000 when I die and if I get accidentally killed you would get $5,000 in cash and the house and lot. There ain't any-thing in marrying young fellows that hasn't got anything. They will just drag you round and about just like they do before they marry. Of course there are some few that makes good. But you would have to work just as hard as you do now, and possibly harder. I know of course that things come up sometimes that is not pleasant at home but it would come up just the same if you was married, and perhaps worse and things could be a hold lot worse if you married. Now take my advice and let me here from you by return mail."

When the age of Ella Hobson, her dependent condition, and the temptation such condition may have been to make a hasty and imprudent marriage, the relationship existing between her and T. W. Barnes, the interest he evinced in her welfare, and the time during which she was to refrain from marrying, are considered, it seems to us it should not be held that the finding of the trial court that the restraint imposed was reasonable was unwarranted. The case on its facts is not like the Doremus, Flynn, and Sinnickson Cases, referred to above. In neither of those cases did it appear that the other party to the contract had the interest of kinship in the plaintiff, or any interest because of any kind of relationship between them. In neither of those cases was the age of the plaintiff at the time the contract was entered into shown. And in neither of them was any other circumstance shown relevant to the reasonableness of the restraint, except the time it was to operate.

[4-6] Appellees insist that if the agreement of Ella Hobson not to marry before she was 22 years of age was not a consideration the law recognized as sufficient to support a contract, because of the rule in question, her promise and compliance with it to be a "good girl" was a sufficient consideration for the contract and bound T. W. Barnes to comply with his undertaking thereunder. It is asserted in support of the contention that Ella Hobson "was under no obligation to T. W. Barnes to be a good girl," and that her promise was within a rule stated in 13 C. J. 324, as follows:

"A valid consideration may be the doing or the promising to do something not illegal, at the request of the promisor, which the promisee is not already under legal obligation to do, or the forbearing to do something which he has a legal right to do. It is clear that a consideration need not be a thing of pecuniary value or even reducible to a money value. A promise, for example, to pay another a certain sum of money if he will abstain from the use of liquor and tobacco for a certain time is binding in favor of the promisee, on the ground that a man has a legal right to use liquor and tobacco. And so it has been held of a promise to pay to a divorced wife a stated annuity if she will conduct herself with sobriety and in a reputable, orderly and virtuous manner, as she is under no obligation to the husband to remain sober or virtuous."

The word "good" as commonly used ·has more than one meaning. There is no testimony in the record as to what T. W. Barnes meant by it in the phrase "be a good girl," used in his letter to Ella Barnes dated November 11, 1913, set out above; but Ella Hobson testified she understood him to mean that she would not present a claim against her grandmother's estate—on what account was not stated. It can hardly be doubted if T. W. Barnes, in using the word referred to meant what Ella Hobson understood him to mean, and she had or was asserting a claim against her grandmother's estate, that her agreement to forego presenting it would be a sufficient consideration for T. W. Barnes' undertaking to will her the house and lot in Dallas he had in mind when he wrote the letter. And while the majority of the court think to the contrary, it is not clear to the writer that Ella Hobson's agreement to be a good girl until she was 22 years of age, and her admitted compliance with the agreement in whatever sense the words may have been used, was not a sufficient consideration for the contract. If it was, then the fact that the undertaking of T. W. Barnes was also based on a consideration the law did not recognize as valid was not a reason why the contract should not be enforced. The rule that "if there are several considerations for one promise, some of which are legal and others illegal, the promise is wholly void," would not apply because neither of the two considerations on which the contract in question here was based was illegal. King v. King, 63 Ohio St. 363, 59 N. E. 111, 52 L. R. A. 157, 81 Am. St. Rep. 635; Fletcher v. Osborn, 282 Ill. 143, 118 N. E. 446, L. R. A. 1918C, 331; Jones v. Sullivan, 9 Ont. L. 27, 4 Ann. Cas. 729. In the King Case the court said:

"A void contract is one which has no legal force, and which, for that reason, cannot be enforced: an unlawful contract is one to do an act which the law forbids, or to omit an act which the law enjoins, and for that reason is nonenforceable. There is no provision, either by statute or at common law, which enjoins upon any particular person the duty to marry; nor can any one be punished for not marrying. To marry or not to marry is left to the free choice of all who are eligible to marriage. Hence to omit to marry is not illegal, though the promise to omit is one which the law will not enforce. It would appear naturally to follow that the only result of making such a promise would simply be that no legal right could be founded on the promise, and no remedy afforded for its breach. It is difficult to see any good reason for denouncing such contract as illegal in the sense of violating any law, or of placing parties who have entered into it outside the pale of the law."

[7] Both appellant and appellees complain of the judgment so far as it was in Ella Hobson's favor for $1,050 of the $7,000 she claimed as damages she was entitled to for the breach by T. W. Barnes of his undertaking, as alleged, to will her the property in Dallas known as 4017 Worth street. Appellant insists Ella Hobson was not entitled to anything on account of that claim, while appellees insist she was entitled to have the claim established for $5,000, the value of the property as found by the trial court.

Appellant urges in support of her contention that if the recovery was upon the express contract set up in appellee's petition it was without support in the testimony, and that if it was upon the implied contract to pay Ella Hobson the value of services she rendered in keeping house for T. W. Barnes in Dallas, set up in said petition, it was unauthorized because the right of appellees to maintain a suit therefor was barred by the statute of limitations of two years at the time the suit was commenced. When the findings of the trial court (set out above) are looked to, it is plain, we think, that the basis of the judgment for the $1,050 was the express contract, and not the implied contract set up in the petition. That being true, it is necessary in disposing of the contention to determine whether the findings of the court referred to had sufficient support in the testimony or not.

[8, 9] Due, doubtless, to the fact that Ella Hobson and T. W. Barnes alone knew the conditions under which Ella Hobson went to Dallas in June, 1916, and kept house for T. W. Barnes until January, 1919, and the facts that T. W. Barnes was dead and Ella Hobson could not because of the inhibition in the statute (article 3690, Vernon's Statutes) testify as to those conditions, there was no direct evidence showing that they entered into a contract about the matter, as found by the court, and, if they did, what the terms of the contract were. J. A. Barnes testified that he began rebuilding the house at 4017 Worth street for T. W. Barnes in January, 1916; that while he was engaged in that work T. W. Barnes told him that he wanted him to make a "good job of it, he was going to give the house to Ella"; that she was "coming to live with him and he was going to make her his heir." The witness further testified that in June, 1916, Ella Hobson was living with him and his family at Roxton, when T. W. Barnes came to where the witness was at a gin; that T. W. Barnes then stated to him that Ella Hobson was going to Dallas to keep house for him; that directly afterward T. W. Barnes called up Ella Hobson over the 'phone and had her to come to the gin, telling her he had "important matters he wanted to talk to her about"; that after T. W. Barnes talked with Ella Hobson on that occasion, he stated to the witness that she "would soon leave the witness' house and go to Dallas to keep house for him" (T. W. Barnes); that he had made a trade with her to that effect. Arthur Barnes testified that while Ella Barnes was keeping house for T. W. Barnes

in Dallas, at 4017 Worth street, he asked said T. W. Barnes what he was paying her to stay with him, and T. W. Barnes replied:

"I am not paying her anything now, but I have provided for her and she will get this place that we are living in now."

It appeared from a will made by T. W. Barnes November 29, 1916 (revoked by a will he made November 9, 1919), that he then made provision for her by bequeathing to her practically all his estate.

[10] We do not think the testimony referred to (and it is all we have found in the record which can be regarded as pertinent to the issue) warranted the finding of the trial court that T. W. Barnes contracted with Ella Hobson to bequeath her the Worth street property in consideration of an undertaking on her part to live with and keep house for him in Dallas until she was 22 years of age. The rule is that an agreement to make a will in return for services must be "fully and satisfactorily proved." Dyess v. Rowe (Tex. Civ. App.) 177 S. W. 1001. The most the testimony can be said to have established was that T. W. Barnes intended in 1916 to compensate Ella Hobson for service she was rendering him, by making provision for her in his will. The testimony wholly failed to show, we think, that he agreed with her to will her the Worth street or any other property as compensation for her services. It was sufficient, we think, to show that T. W. Barnes was liable to Ella Hobson in the sum found by the court on the implied contract set up in the petition, but, as we have seen, the judgment was based on a finding that the contract was an express one. Whether the judgment should nevertheless be affirmed because supported by the pleading and testimony, if it were otherwise valid, need not be determined, for it was not otherwise valid. Appellant defended against the recovery had on the ground that the cause of action asserted by appellees on the implied contract was barred by the statute of limitations of two years at the time the suit was commenced. We think the defense was established by the testimony, and that appellees should have been denied the recovery had on account of service Ella Hobson rendered in keeping house for T. W. Barnes. It was shown that she ceased to perform such service January 15, 1919. She might then have sued for the value of service she had rendered, but she did not, and this suit was not commenced until more than two years thereafter, to wit, April 10, 1922,

The conclusion reached that the testimony did not warrant the finding that T. W. Barnes contracted with Ella Hobson to will her the Worth street property, if she would go to Dallas and keep house for him until she was 22 years of age, in effect overrules appellees' contention that they were entitled to have Ella Hobson's claim based on the alleged breach of such a contract allowed for $5,000, the value of said Worth street property as found by the court.

The judgment will be affirmed so far as it approves the claim of Ella Hobson for $5,000 based on the contract of November, 1913, and will be reversed so far as it approved for the sum of $1,050 the claim of Ella Hobson based on the contract alleged to have been made in June, 1916, and judgment will be rendered here that appellees take nothing on account of the claim based on that contract.

HODGES, J. (dissenting). I shall not undertake to restate the facts so clearly set out in the opinion of Chief Justice WILLSON, nor shall I rely upon any authorities other than those cited by him. There seems to be no substantial difference of opinion among the courts regarding the legal effect of an unnecessary contractual restriction on the right of marriage. A general restraint of marriage, as I understand it, is one which is unconditional, although it may be limited as to time—one which binds a person who is legally and physically qualified, to not marry any person, under any condition, for a definite or an indefinite period of time. A partial restraint is one which is coupled with some condition, as until a certain impediment is removed, or one which bars marriage to certain individuals, or class of persons, or one where marriage is conditioned upon the consent of some third person. These, I think, fall within the usual definitions laid down in the books. It is not necessary that the restriction be perpetual in time in order to be general; it is sufficient if it be unconditional and total or universal, even though it is to operate for only a limited time. (See the cases first cited by the CHIEF JUSTICE.) None of the others is in conflict with that view.

It remains, then, to determine whether or not the contract in this instance imposed a general restraint upon the right of the appellee to marry.

The material facts are undisputed. She was 16 years old at the time the contract was made. There was nothing tending to show that she was not physically fitted for marriage, or that by marriage her condition would not be improved, or that the other contracting party would gain any benefit by her remaining unmarried. She was then, presumptively, competent to contract the marriage relation with the consent of her father, who was then living. She was poor, and apparently without any means of support except her own labor and the voluntary assistance supplied by relatives other than her own father, who had married a second wife. She was, in all essential respects, a mere waif, without a home, and dependent upon charity.

While in that condition she bound herself not to marry any one until she arrived at the age of 22, four years after she attained the age when she might legally have married without the consent of parent or guardian. If during that time she had met a man whom she wished to marry, and who wished to marry her, and who was able to provide her with a good home and all the comforts of life, she could not have married him without breaking her contract with Barnes, even if she had her father's consent, and though such a marriage at such a time might have vastly improved her social, financial, and physical condition in life.

The personal interest which Barnes had in the welfare of the appellee does not make the situation legally different, nor does it legalize what would otherwise be an invalid agreement. If it were against public policy for her to contract for a general restraint on her privilege of marrying, the fact that she did so because Barnes felt an interest in her welfare would not relieve the contract of its offensive feature. The only reason given by Barnes in the letter relied on as evidence of the contract is thus stated:

"There ain't anything in marrying young fellows that hasn't got anything. They will just drag you around and about just like they do before they marry."

It does not appear from the record that he had any particular individual in view as likely to marry his niece if she were not thus restrained. There is no evidence tending to show that this contract was made for the purpose of preventing her from contracting a hasty or an improper marriage. There is nothing to indicate that she even contemplated marrying any one at that time. For these reasons I conclude that this contract was void upon the ground that it was a general restraint of marriage.